650 A.2d 260

ALEXANDER & ALEXANDER INC. and Mary D. Scheeler

v.

B. DIXON EVANDER & ASSOCIATES, INC.

No. 53, Sept. Term, 1993.

Court of Appeals of Maryland.

Dec. 8, 1994.

Nell B. Strachan (Benjamin R. Civiletti, Mitchell Y. Mirviss, Venable, Baetjer and Howard, all on brief), Baltimore, for petitioners.

Jim McCadden, Towson (Patrick A. O'Doherty, Amy J. Muffolett, all on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, BELL and RAKER, JJ., and CHARLES E. ORTH, Jr.*, Judge (retired), Specially Assigned.

ELDRIDGE, Judge.

This case involves a challenge to awards of punitive damages against Alexander & Alexander, an insurance broker, and

---

* Orth, J., retired, and specially assigned, participated in the hearing and conference, but died prior to the filing of the opinion.

against Mary Scheeler, one of its vice presidents. A jury awarded the punitive damages under a count alleging tortious interference with a contractual arrangement concerning insurance commissions. The jury determined that the plaintiff, B. Dixon Evander & Associates, Inc., was entitled to $4,000,000.00 in punitive damages from Alexander & Alexander and $1,000,000.00 in punitive damages from Mary Scheeler. The issue before us is whether there was any basis for the awards of punitive damages.

## I.

B. Dixon Evander is the founder, owner and principal officer of B. Dixon Evander & Associates, Inc., an insurance brokerage corporation.[1] The corporation specializes in procuring medical malpractice liability insurance for health care providers. In 1962, Evander was invited to submit a proposal for medical malpractice insurance for the University of Maryland Hospital and its staff. Evander obtained from the hospital the right to procure such insurance, and, between 1962 and 1985, Evander developed and managed a professional liability program for the hospital and its medical staff.[2]

Initially, Evander had secured insurance for the hospital from St. Paul Fire & Marine Insurance Company. In 1975, St. Paul decided to withdraw from the state's medical malpractice market, and Evander procured policies for the hospital from the Mutual Fire, Marine & Inland Insurance Company ("Mutual Fire"). Evander negotiated the Mutual Fire policies through Mutual Fire's general underwriting manager and agent, Shand, Morahan & Company, Inc. ("Shand"). Shand

---

**1.** Hereinafter, B. Dixon Evander & Associates, Inc., will simply be referred to as "Evander." The individual B. Dixon Evander will be referred to as "Mr. Evander."

**2.** The insurance relevant to this case consists of two professional liability insurance policies and their renewals. The policies include as named insureds the hospital and medical professionals employed by various entities that are now part of the University of Maryland Medical Systems Corporation. Hereinafter we shall refer to the named insureds collectively as the "hospital."

was a wholly-owned subsidiary of Alexander & Alexander, an insurance brokerage firm.

The Mutual Fire policies were "claims made" policies. Thus, a claim would be covered only if it were made within the policy period. Because of some unusual features of medical malpractice claims, such as the relative frequency of latent injury, the termination of a claims made policy left the insured exposed for many years to liability for events that had occurred within the policy period. This potential exposure concerned the hospital, as the hospital's financial planning was undermined by uncertainty about the number and extent of the malpractice claims which it might receive. Because of this concern, the initial Mutual Fire policies contained an Optional Extension Provision ("OEP") allowing the claims reporting period to be extended beyond the policy period in return for the payment of an additional premium. As rewritten in 1981, the OEP authorized the hospital to extend the claims reporting period indefinitely by making a single payment of 155% of the premium for the policies' final year. The OEP included the requirement that the hospital exercise the option, and pay the additional premium, within 30 days after terminating the policies. The OEP was included in each annual renewal of the policies.

Evander's relationship with the hospital continued amicably until 1984. In 1984 the hospital underwent an organizational change, becoming part of a corporate entity separate from the University of Maryland. One consequence of that change was the establishment of a committee, led by Dr. Susan S. Swift, to assess and review the hospital's insurance needs. The committee sent out "requests for proposals" to a number of insurance brokers, including Evander and Alexander & Alexander ("Alexander"). The requests for proposals asked detailed questions about the brokers' organizations and about their experience and ability in the field of professional liability insurance. After reviewing the proposals of the six brokers who responded, the committee, on behalf of the hospital, chose Alexander to succeed Evander as the hospital's broker.

On January 30, 1985, the hospital issued a "broker of record" letter, authorizing Alexander to represent its insurance interests. The letter allowed Alexander to negotiate on the hospital's behalf "as respects changes in existing insurance policies and in closing, changing, increasing or cancelling insurance...." The letter specifically provided that it was "intended to include all policies presently placed with Mutual Fire ... through Shand, Morahan & Company."

Evander was disappointed by the hospital's decision. Mr. Evander wrote to Dr. Swift, telling her that "[h]aving initiated, developed and shepherded the current program through the past ten (10) years we feel, to be candid, as if there has been a death in the family without knowing the cause." Mr. Evander explained that he had continually modified the hospital's insurance program over the years, negotiating with Shand and Mutual Fire for concessions for his client. Under the circumstances, he wrote, it would be unfair for the hospital to appoint another broker if it intended to renew the Mutual Fire policies, because "to have [another broker] step into our shoes after establishing and developing the program, we trust you will agree is an unearned position."

Bob Liston, the Shand Vice President responsible for the hospital account, agreed with Evander. By February 1, 1985, Liston had learned that Alexander was ready to send Shand a broker of record letter from the hospital. On that date he wrote a memorandum to Joe Prochaska, Shand's Chairman, explaining that he had told Evander once, and Dr. Swift twice, that Shand would not accept a broker of record letter on the Mutual Fire policies from anyone except Evander. In support of his position, Mr. Liston noted Mr. Evander's many achievements for Shand: business worth over $39,000,000 which he had produced for Shand from Maryland, his careful attention to insurance legislation in Maryland, and his support of Shand through the implementation of sharp rate increases.

For its part, the hospital was concerned that it might lose its access to Mutual Fire. The hospital committee was reluctant to forego any options in the precarious liability insurance

market, and Dr. Swift told Alexander that Alexander's continued representation of the hospital depended on an agreement from Shand that the hospital, through Alexander, could renew the existing Mutual Fire policies if the hospital chose to do so.

Joe Prochaska and Mac Calhoun, the Chairman and President of Shand, were asked to attend a meeting of top Alexander executives in Scottsdale, Arizona, in early February 1985. Prochaska and Calhoun met with the President of Alexander, Michael White. As a consequence of the meeting, White called Dr. Swift to tell her that Shand had no option but to accept the broker's letter from Alexander, and Shand did accept the letter.

At some time in early 1985, the hospital and Alexander entered into a brokerage contract. Alexander was appointed broker for the hospital for one year,[3] beginning July 1, 1985.[4] Alexander was to provide a full range of brokerage services, and the hospital was to pay a flat annual fee of $250,000, payable in monthly installments. The parties expressly noted the consequences of the flat fee arrangement, stating in their agreement that

> "[t]he fees are intended to replace the commissions associated with procuring insurance. Therefore, all insurance quotations should be obtained net of commission fees. If this is not possible a credit will be granted in an amount equal to the commission."

This provision obliged Alexander to give the hospital credit for any insurance payment by the hospital that represented commission, since Alexander would already have been paid an agreed price for its services.

After Alexander's appointment as broker, and before the July 1, 1985, date for termination of Evander's services,

---

**3.** The agreement provided each party with the option to withdraw on thirty days' notice to the other.

**4.** The effective date of the Mutual Fire policies was July 1. Alexander and the hospital chose the anniversary and renewal date of the existing insurance coverage to begin their relationship.

Evander continued to service the hospital account and to receive its commission on premiums paid by the hospital. Meanwhile, Alexander and the hospital were reviewing the range of available insurance options. Ultimately the hospital chose a system of self-insurance rather than renewal of the Mutual Fire policies. This decision was predicated on the exercise of the OEP option.

On May 6, 1985, Alexander told Shand that the hospital would not renew the Mutual Fire policies when they expired at the end of June. Alexander also told Shand that the hospital intended to exercise the OEP option. Shand passed the news on to Evander. On May 8, 1985, Evander sent a letter to the hospital, explaining how the OEP option had to be exercised and calculating the premium for the exercise of the option. Evander also claimed a commission on the premium. The alleged prior understanding between Shand and Evander was that Evander would receive a commission of 8% of premiums on policies procured by Evander. Evander calculated the amount of the OEP premium to be over $3,000,000, and asked Shand for a commission of $265,907.28.

Evander's request for a commission on the OEP premium threatened to wipe out Alexander's entire fee from the hospital for the year beginning July 1, 1985. If Shand's bill to the hospital were to include a sum equal to Evander's commission, as the bill undoubtedly would if Shand paid Evander, then, under the terms of the fee agreement between Alexander and the hospital, Alexander would be obliged to credit the hospital with the amount of the commission. Alexander asked Shand to bill the hospital for the exercise of the option in an amount that did not include Evander's commission. Shand refused. Alexander's position was that the hospital owed no commission to anyone, since the exercise of the option was an insurance service covered by Alexander's flat fee. Shand insisted that it owed Evander a commission on the premium. Shand, however, ultimately complied with Alexander's request, and the hospital received and paid a bill for a sum which did not include an amount equal to the commission demanded by Evander. Consequently, Evander received no commission for

the premium that the hospital paid to exercise its rights under the OEP provision.

Evander then brought the present action in the Circuit Court for Baltimore City against Alexander, Shand, Mutual Fire and Mary Scheeler, an Alexander vice president and the executive responsible for the hospital account. Evander sought compensatory damages equal to the commission on the OEP and punitive damages. Evander's complaint contained fourteen counts. Only three were ultimately submitted to the jury: a breach of contract count against Shand and Mutual Fire, a count charging tortious interference with contract against Alexander and Scheeler, and a tort count based on "civil conspiracy" against all four defendants. Evander sought only compensatory damages under the breach of contract count, but asked for both compensatory damages and $5,000,000.00 in punitive damages under each of the two tort counts.

At trial, in connection with its claim for a commission on the OEP, Evander introduced into evidence a document, "PX43," that allegedly contained the terms of a 1975 exclusive Producer's Agreement between Shand and Evander. The document, which had been sent by Shand to Evander in 1975, set out the proposed terms and conditions under which Evander was to produce medical malpractice insurance business for Shand. Evander had responded in 1975 by sending a letter to Shand explaining that PX43 did not reflect the agreement between the parties because it omitted both a ninety day notice provision for termination and an agreement that Evander's commission would remain unchanged for three years.[5] Evander's letter stated that it would sign PX43 promptly if its requested changes were made. Shand denied that there had ever been any agreement that Evander's commission would be fixed for a three year period.[6] Instead, Shand offered to "forward the necessary document" if Evander wished to execute a contract including the ninety day notice provision, but excluding the

---

5. Evander's letter was admitted into evidence as PX44.

6. Shand's letter was admitted into evidence as PX45.

three year fixed commission. The record contains no evidence that Shand and Evander ultimately agreed on the terms of their relationship. Nonetheless, Evander took the position at the initial trial that the exclusive agreement described in PX43 gave it the sole right to receive a commission on the OEP.

Evander at the first trial also produced an expert witness in insurance matters, who testified that a party who produces an insurance policy is, according to custom and usage in the insurance industry, entitled to receive the commission on an OEP exercised when the policy is terminated. In addition, Mr. Evander testified to the course of his dealings with Shand and Mutual Fire over the years.

In connection with evidence of "malice," a component of both the tortious interference claim and the request for punitive damages, Mr. Evander was permitted, over objection, to testify to comments allegedly made by Mary Scheeler. Mr. Evander told the jury that a vice president of Shand had told him during a telephone conversation that Scheeler "hates your ass" and intended to drive him out of business. Similar testimony from Evander's former office manager was also admitted.

The jury found for Evander under the breach of contract count and further found that "the precise commissions that Evander lost" were $250,052.52 plus interest. The jury also found Alexander and Scheeler liable under both tort counts. The verdict sheet did not require the jury to assess separate compensatory damages on these counts; the parties had agreed that, if there was liability under the tort counts, the compensatory damages would be the same as under the contract count. The jury found that Alexander and Scheeler had tortiously interfered with a contractual relationship between Evander and Shand, and had done so with actual malice. Furthermore, the jury found that "Alexander and Scheeler ... entered into a conspiracy with Shand and Mutual Fire ... to deprive Evander of commissions...." The jury found all the defendants liable for punitive damages under the tort counts, although the verdict sheet did not allocate punitive

damages between the two tort counts.[7]  The jury assessed the amounts of punitive damages as follows: $40,000,000.00 against Alexander; $250,052.52 against Scheeler; and $70,-104.15 against Shand and Mutual Fire.

The trial court reduced the amount of the punitive damages awarded against Alexander to $12,500,000.00.  Alexander and Scheeler appealed, challenging both the determinations of liability and the awards of punitive damages.  Alexander and Scheeler argued, *inter alia*, that there was no basis for a finding of actual malice.  In this connection, they argued that evidence of Mary Scheeler's alleged statements had been improperly admitted.  For reasons that do not appear in the record, Evander abandoned and released its claim for punitive damages against Shand and Mutual Fire before the case was argued in the Court of Special Appeals.[8]

---

**7.**  In this connection, *see Caldor v. Bowden*, 330 Md. 632, 660-664, 625 A.2d 959, 972-974 (1993).

**8.**  Since Shand and Mutual Fire were parties to the alleged contractual arrangement for commissions, Shand and Mutual Fire could not be liable for tortiously interfering with that contractual arrangement.  *See, e.g., Travelers Indemnity v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 89, *cert. denied*, ‒‒‒ U.S. ‒‒‒, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992); *K & K Management v. Lee*, 316 Md. 137, 154-156, 557 A.2d 965, 973-974 (1989); *Sharrow v. State Farm Mutual*, 306 Md. 754, 763, 511 A.2d 492, 497 (1986).  Consequently, the count charging interference with contractual relations was submitted to the jury only against Alexander and Scheeler.  Awarding punitive damages for breach of contract is "[c]ontrary to the settled policy of Maryland law," *K & K Management, supra*, 316 Md. at 169, 557 A.2d at 981.  Therefore, the punitive damages against Shand and Mutual Fire must have rested on the "civil conspiracy" tort count.

In this connection, we note that "conspiracy" is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.  As Judge Alvey said for this Court in *Kimball v. Harman and Burch*, 34 Md. 407, 410-411 (1871), "an act which, if done by one alone, constitutes no ground of action on the case, cannot be made the ground of such action by alleging it to have been done by and through a conspiracy of several."  Later, as Chief Judge, he further explained for the Court in *Robertson v. Parks*, 76 Md. 118, 135, 24 A. 411, 413 (1892):

"[I]t is a general rule, that a conspiracy cannot be made the subject of a civil action, unless something is done which, without the conspiracy, would give a right of action.  The damage done is the gist of the

The Court of Special Appeals upheld the award of compensatory damages under all three counts. With respect to punitive damages, however, the Court of Special Appeals vacated the awards and ordered a new trial. As the court explained, "[t]his was, at bottom, a commercial dispute between two business competitors." *Alexander v. Evander,* 88 Md.App. 672, 719, 596 A.2d 687, 710 (1991). Reviewing the trial court's proceedings in light of *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), a case decided after the judgment against Alexander had been rendered, the intermediate appellate court concluded that "[o]n this record, we do not believe that a $12.5 million punitive award comports with due process." *Alexander v. Evander, supra,* 88 Md.App. at 720, 596 A.2d at 710. The court remanded the case for a new trial, limited to "the issue of whether [the defendants'] conduct justifies an award of punitive damages and, if so, in what amount." 88 Md.App. at 722, 596 A.2d at 711–712.

The Court of Special Appeals' opinion was somewhat confusing with respect to the new trial. The court stated that the second jury should be instructed to assume as facts the specific findings listed on the first jury's verdict sheet, including the facts that Alexander and Scheeler tortiously interfered with a contract of Evander's, and that they did so with actual malice. 88 Md.App. at 722 and n. 14, 596 A.2d at 712 and n. 14. Nevertheless, the Court of Special Appeals also directed

---

action, not the conspiracy. When the mischief contemplated is accomplished, the conspiracy becomes important, as it may affect the means and measure of redress. The party wronged may look beyond the actual participants in committing the injury, and join with them as defendants all who conspired to accomplish it; and the fact of the conspiracy may aggravate the wrong; but the simple act of conspiracy does not furnish a substantive ground of action."

See also *Green v. Wash. Sub. San. Comm'n,* 259 Md. 206, 221, 269 A.2d 815, 824 (1970); *Rent-a-Car Co. v. Fire Ins. Co.,* 161 Md. 249, 260, 156 A. 847, 852 (1931); *Brinkley v. Platt,* 40 Md. 529, 536 (1874).

As pointed out above, a party to contractual relations cannot be liable for the interference tort based on those contractual relations. The tort is aimed at the person who interferes with the contract, and not at one of the contracting parties. We do not believe that this principle can be circumvented by the "conspiracy" device.

that the second jury should be given a definition of actual malice and told that actual malice is a requirement for an award of punitive damages. 88 Md.App. at 722, 596 A.2d at 712. The intermediate appellate court did not address Alexander's and Scheeler's contention that the trial court's instructions on actual malice had been inadequate.[9]

Both sides petitioned this Court for a writ of certiorari. In particular, Alexander and Scheeler in their petition argued that Evander had failed to establish its tortious interference claim because "at least three, and probably *all* " of the elements of the tort had not been proven. Evander, on the other hand, challenged the trial court's grant of summary judgment in favor of the defendants on counts alleging fraud, fraudulent concealment, conversion and conspiracy to commit each of those torts. In light of the remand for a new trial on punitive damages, we denied both petitions. *Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc.*, 323 Md. 1, 590 A.2d 158 (1991).

Prior to the new trial, Alexander paid Evander the compensatory damages award, with interest, on its own behalf and on behalf of Shand and Scheeler. By the time of the second trial, Evander had dismissed its claims for punitive damages against Shand and Mutual Fire. Alexander and Scheeler were the only remaining defendants, and tortious interference with contractual relations was the only legal theory for the recovery of punitive damages.

---

**9.** In fact, the jury at the first trial was never given an actual malice instruction with respect to Alexander and Scheeler. Actual malice was defined for the jury only in connection with a conspiracy instruction. Later, the jury was told that it could award punitive damages against Shand and Mutual Fire if it found that Shand and Mutual Fire had committed "tortious action in addition to a breach of contract." The instructions did not mention Alexander as a party to the conspiracy, and punitive damages were not mentioned in connection with the tortious interference instruction directed at Alexander and Scheeler. Alexander and Scheeler specifically objected at trial to the court's failure to give the actual malice instruction that they requested in connection with the tortious interference count, and they argued on appeal that the trial court had inadequately instructed the jury with respect to actual malice.

The punitive damages retrial lasted over three and a half weeks. Evander presented largely the same evidence which it had at the first trial, with the addition of evidence of Alexander's net worth.

At the second trial, Alexander challenged Evander's characterization of PX43 as a writing that formally embodied the relationship between Evander and Shand. Alexander introduced evidence that Mr. Evander had testified at an unrelated trial that PX43 had never been executed or agreed to. Moreover, at the unrelated trial, Mr. Evander had claimed that, even if PX43 did reflect an informal agreement, it had been cancelled and terminated in October 1975. At the punitive damages retrial in this case, Alexander questioned Mr. Evander about this testimony, and Mr. Evander acknowledged that PX43 had been cancelled.

As previously discussed, at the first trial Mr. Evander had testified, over hearsay objections, to comments allegedly made by Mary Scheeler about her attitude towards Mr. Evander and his business. At the retrial, the court excluded this evidence on the ground that it was "inflammatory" and inadmissible hearsay.

At the conclusion of the second trial, the trial court, over the defendants' objection, instructed the jury as follows:

"You are to assume as fact the following:

One, that Shand ... and Mutual Fire ... had a contract with the plaintiff that entitled the plaintiff to a commission on the [OEP];

Two, that Shand and Mutual Fire breached or broke that contract with the plaintiff;

Three, that the defendants, Alexander & Alexander, and Scheeler, tortiously interfered with the plaintiff's contract with Shand and Mutual Fire.... That this tortious interference by the defendants ... was done with actual malice."

The court further instructed the jury that "actual malice is the performance of an act without legal justification or excuse but with evil or rancorous motive influenced by hate, spite or ill

will, the purpose being to deliberately and wilfully injure the plaintiff." The court told the jury that it could award punitive damages or not, as it saw fit, and explained that Evander had the burden of proving its entitlement to punitive damages by "a preponderance of the evidence."

The defendant made several objections to the court's instructions, including, *inter alia*, an objection to the instruction that Evander must prove its entitlement to punitive damages by a preponderance of the evidence, rather than by clear and convincing evidence.[10]

The second jury awarded punitive damages against Alexander in the amount of $4,000,000.00 and against Scheeler in the amount of $1,000,000.00.[11]

The defendants appealed to the Court of Special Appeals and Evander cross-appealed. Prior to any proceedings in the intermediate appellate court, both sides filed petitions for a writ of certiorari which this Court granted, 331 Md. 284, 627 A.2d 1063 (1993). In this Court, the defendants argue, *inter alia*, that the evidence shows that no tort was ever committed,[12] that there was no evidence of actual malice, and that the punitive damages award should be set aside because it was not "rendered with meaningful standards." Evander complains about the exclusion from the second trial of evidence concerning the alleged statements attributed to Mary Scheeler.

## II.

■ Punitive damages may be awarded only, *inter alia*, if there was tortious conduct accompanied by "malice." *Owens-*

---

**10.** After the Court of Special Appeals had reviewed the first trial but before the retrial on punitive damages had begun, we decided *Owens-Illinois v. Zenobia*, 325 Md. 420, 469, 601 A.2d 633, 657 (1992), which, *inter alia*, requires a plaintiff to establish entitlement to punitive damages by clear and convincing evidence.

**11.** It had been made clear at trial that Alexander would pay any damages awarded against Scheeler.

**12.** The primary ground for this argument is Alexander's and Scheeler's contention that PX43, the "contract" which formed the basis of Evander's tortious interference claim, never existed.

*Illinois v. Zenobia,* 325 Md. 420, 454–460, 601 A.2d 633, 650–653 (1992). Consequently, while the award of compensatory damages in favor of Evander is not directly before us, the question of whether there was tortious conduct in this case is obviously pertinent in deciding the allowability of punitive damages. Since "the availability of a punitive damages award ought to depend upon the heinous nature of the defendant's *tortious* conduct," *Zenobia,* 325 Md. at 454, 601 A.2d at 649 (emphasis added), if no tort was committed there can be no basis for a punitive damages award. Moreover, in this particular case, Evander has relied on identical alleged facts to show both the presence of the tort and the actual malice required for the allowability of punitive damages. Under Evander's theory, Alexander's interference with the contractual relationship between Evander and Shand was wrongful, and accompanied by actual malice, because of the ill-will and spite towards Evander disclosed by statements allegedly made by Mary Scheeler.

Maryland recognizes the tort action for wrongful interference with contractual or business relationships in two general forms: "inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships...." *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663, 674 (1984). We explained in the *Natural Design* opinion as follows (302 Md. at 69–70, 485 A.2d at 674):

> "The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation. The two types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved. *See generally Goldman v. Building*

*Assn.,* 150 Md. 677, 682, 133 A. 843 (1926); *Sumwalt Co. v. Knickerbocker,* 114 Md. 403, 414–415, 80 A. 48 (1911)."

*See also Macklin v. Logan,* 334 Md. 287, 297, 639 A.2d 112, 117 (1994); *K & K Management v. Lee,* 316 Md. 137, 154–155, 557 A.2d 965, 973 (1989); *Sharrow v. State Farm Mutual,* 306 Md. 754, 763, 511 A.2d 492, 497 (1986).

Earlier in this litigation, Evander appeared to argue that Alexander and Scheeler tortiously interfered with a specific, subsisting contract between Evander and Shand which gave Evander the exclusive right to a commission on the OEP premium. This contract was the one allegedly described in PX43. At the second trial and in the present appellate proceedings, however, Evander no longer contends that PX43 is the primary source of its right to a commission on the OEP premium. The Court of Special Appeals, after reviewing the record of the first trial, concluded that "Evander's right to a commission on the OEP ... arose from an admixture of the 1975 producer's agreement with Shand and the 1975 policy procured by him from Shand/Mutual Fire, as renewed through June, 1985," and that the "producer's agreement and the Mutual Fire policy were constituent parts of an overall business arrangement between Evander, on the one hand, and Shand and Mutual Fire, on the other." 88 Md.App. at 687, 685–686, 596 A.2d at 694, 693. Evander's brief in this Court represents that Evander's "entitlement to a commission resulted from PX43 and Mr. Evander's understandings, his agreements and his practices with Shand over a 10–11 year period." (Evander's brief at 6). Counsel for Evander stated at oral argument before this Court that Evander's claim to the commission was not based on the alleged exclusivity agreement between itself and Shand, but on custom, usage and the overall course of dealings between the parties.

Consequently, this case does not involve an alleged wrongful interference with a specific, discrete contract between Evander and Shand but interference with an ongoing business relationship that included Evander's entitlement to a commission upon the hospital's exercise of the OEP option. This case

thus implicates the broader form of the tort, namely malicious or wrongful interference with economic relationships.[13]

The elements of the broader form of the tort have remained unchanged in Maryland since this Court articulated them in *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962, 964 (1909) (quoting from *Walker v. Cronin*, 107 Mass. 555, 562 (1871)):

> " '(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.' "

*See K & K Management v. Lee, supra,* 316 Md. at 160, 557 A.2d at 973; *Natural Design, Inc. v. Rouse Co., supra,* 302 Md. at 71, 485 A.2d at 675. Moreover, for punitive damages to be recoverable under either form of the tort, the wrongful interference with contract or economic relations must be accompanied by "actual malice," *i.e.,* conduct by the defendant characterized by evil motive, intent to injure, ill will, or fraud. *See, e.g., Schaefer v. Miller,* 322 Md. 297, 317, 587 A.2d 491, 501 (1991) (concurring opinion); *Rite Aid Corp. v. Lake Shore Inv.,* 298 Md. 611, 626–627, 471 A.2d 735, 742–743 (1984); *Damazo v. Wahby,* 259 Md. 627, 638, 270 A.2d 814, 819 (1970); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 569–570, 69 A. 405, 410 (1908).[14]

---

**13.** Even if Evander were to rely primarily on the 1975 producer's agreement, PX43, the case would involve the broader form of the tort. By its terms, PX43 was terminable at will by either party. Interference with a contract terminable at will is analyzed as interference with economic relations broadly, and not interference with a specific contract. *Macklin v. Logan,* 334 Md. 287, 304–308, 639 A.2d 112, 120–122 (1994).

**14.** This Court's opinion in *Rite Aid Corp. v. Lake Shore Inv., supra,* 298 Md. at 627, 471 A.2d at 743, quotes Chief Judge Hammond for the Court in *Damazo v. Wahby, supra,* 259 Md. at 638, 270 A.2d at 819, as follows:

The malicious interference tort generally arises in a commercial setting. Participants in the economic marketplace are expected to act aggressively in seeking business and furthering their own position in the market.[15] "In the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage." *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 307 (Utah 1982). Courts and commentators have often found it difficult to determine when purposeful interference with business relationships, behavior that is an integral part of commercial competition, should be considered "wrongful" so as to give rise to a cause of action in tort.[16]

This Court has long recognized that self-interested commercial dealing has its proper place in the business world. Thus, in *Goldman v. Building Ass'n,* 150 Md. 677, 684, 133 A. 843, 846 (1926), the Court stated:

" 'Iron sharpeneth iron' is ancient wisdom, and the law is in accord in favoring free competition, since ordinarily it is essential to the general welfare of society, notwithstanding competition is not altruistic but is fundamentally the play of

---

" 'The Maryland rule is that malice in the sense of deliberate and improper violation of a known right, that is, absence of legal justification, will support an action and permit recovery of compensatory damages for deprivation of known contractual rights but that actual malice must be shown to support punitive damages.' *Id.* at 638, 270 A.2d 814."

**15.** The law has long recognized business competition as deserving of protection. *See generally* Bruce Wyman, *Competition and the Law,* 15 Harv.L.Rev. 427 (1902) (discussing the historical progression of competition cases from the fifteenth century to the beginning of the twentieth); Franklin D. Jones, *Historical Development of the Law of Business Competition,* 35 Yale L.J. 905, 36 Yale L.J. 42, 36 Yale L.J. 207, and 36 Yale L.J. 351 (1926) (describing aspects of the social history of England and America that affected the law of business competition from the early thirteenth century until 1925).

**16.** The idea that a tort is a "wrong" is embodied in the notion of fault that lies at the heart of Maryland tort law. *See Nissen Corp. v. Miller,* 323 Md. 613, 623, 594 A.2d 564, 569 (1991) ("[I]n adopting the cause of action for strict liability in tort, this Court has not abandoned the fundamental concept of fault.")

interest against interest, and so involves the interference of the successful competitor with the interest of his unsuccessful competitor in the matter of their common rivalry. Competition is the state in which men live and is not a tort, unless the nature of the method employed is not justified by public policy, and so supplies the condition to constitute a legal wrong."

*See also Macklin v. Logan, supra,* 334 Md. at 302, 639 A.2d at 119; *Natural Design, Inc. v. Rouse, supra,* 302 Md. at 72–73, 485 A.2d at 676. Accordingly, we have made clear in our cases that acting to pursue one's own business interests at the expense of others is not, in itself, tortious. *Macklin v. Logan, supra,* 334 Md. at 304–305, 639 A.2d at 120–121; *Goldman v. Building Ass'n, supra,* 150 Md. at 684–686, 133 A. at 846; *Klingel's Pharmacy v. Sharp & Dohme,* 104 Md. 218, 232, 64 A. 1029, 1031 (1906).

Moreover, this Court has refused to adopt any theory of tortious interference with contract or with economic relations that "converts a breach of contract into an intentional tort." *K & K Management, supra,* 316 Md. at 169, 557 A.2d at 981.[17] The distinction between tort and contract actions in this context is significant. A successful plaintiff in a tortious interference case is not limited to the contract measure of damages, the benefit of the bargain, *Beard v. S/E Joint Venture,* 321 Md. 126, 133, 581 A.2d 1275, 1278 (1990), but can recover "the more extensive tort damages." *Rite Aid Corp. v. Lake Shore Inv., supra,* 298 Md. at 622, 471 A.2d at 740–741. Those damages "include the pecuniary loss of the benefits of the contract, consequential losses for which the tortious act is the legal cause, emotional distress and actual harm to reputa-

---

**17.** Commentators note that the law should at least tolerate, if not favor, breach of contract "if B can breach a contract with A, pay damages to A, and still come out ahead. . . ." Dan B. Dobbs, *Tortious Interference with Contractual Relationships,* 34 Ark.L.Rev. 335, 360 (1980). *See also* Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine,* 49 U.Chi.L.Rev. 61, 79–91 (1982); Donald C. Dowling, Jr., *A Contract Theory for a Complex Tort: Limiting Interference with Contract Beyond the Unlawful Means Test,* 40 U.Miami L.Rev. 487, 506–508 (1986).

tion ... and, in appropriate circumstances, punitive damages."
298 Md. at 622, 471 A.2d at 740.[18]

The tort of wrongful or malicious interference with economic relations requires intentional acts " 'done with the unlawful purpose to cause ... damage and loss [to the plaintiffs in their lawful business], without right or justifiable cause on the part of the defendants (which constitutes malice)....' " *Willner v. Silverman, supra,* 109 Md. at 355, 71 A. at 964. In *Natural Design, Inc. v. Rouse Co., supra,* 302 Md. at 71, 485 A.2d at 675, we reviewed our prior cases and noted that various factors might supply the element of malice under appropriate circumstances. *See, e.g., Willner v. Silverman, supra,* 109

---

**18.** In this connection, we note that in some other jurisdictions the distinction between breach of contract and tortious interference has been somewhat obscured. In 1969, Dean Prosser summarized numerous cases nationwide as holding that a person who "purposely interfered with somebody else's business" would be prima facie liable for the tort of malicious interference, and would bear "the burden of justifying his conduct by competition." 46 A.L.I.Proc. 196 (1969). This analysis was described as "reach[ing] the astounding result that the competitive order which we hold out to the world as a model is prima facie illegal." *Id.* at 201.

Even in our opinions, some language suggests that when a plaintiff relies upon interference with a specific contract, purposeful interference itself triggers liability. *See, e.g., Cumberland Glass Mnf'g Co. v. DeWitt,* 120 Md. 381, 394–395, 87 A. 927, 932 (1913), *aff'd* 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 564, 69 A. 405, 408 (1908). On the other hand, we have on occasions specifically rejected this analysis. *See Travelers Indemnity v. Merling, supra,* 326 Md. at 343, 605 A.2d at 90 (deliberate interference could not provide basis for tort where it was not "wrongful or unlawful"); *Sharrow v. State Farm Mutual, supra,* 306 Md. at 764–765, 511 A.2d at 498 (intentional breach of an existing contract only tortious if "wrongful or improper").

Since this case concerns only the broader form of the tort, which unquestionably requires more than purposeful interference, we need not further explore this matter. Nevertheless, we note that legal scholars are generally critical of the broad scope of the malicious interference tort in many jurisdictions. *See, e.g.,* Francis Bowes Sayre, *Inducing Breach of Contract,* 36 Harv.L.Rev. 663 (1923); Dan B. Dobbs, *Tortious Interference with Contractual Relationships, supra,* 34 Ark. L.Rev. at 335; Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies, supra,* 49 U.Chi.L.Rev. at 61; Donald C. Dowling, Jr., *Beyond the Unlawful Means Test, supra,* 40 U.Miami L.Rev. at 487.

Md. at 357, 71 A. at 964 (actual malice, such as ill will or spite); *McCarter v. Chamber of Commerce*, 126 Md. 131, 136, 94 A. 541, 542 (1915) (" 'wrongful act done intentionally without just cause or excuse' "); *Goldman v. Building Assn., supra*, 150 Md. at 682, 133 A. at 846 (unlawful acts). In *Natural Design*, the Court held that acts of interference committed in violation of a state antitrust statute constituted acts of wrongful or malicious interference.

In *K & K Management v. Lee, supra*, 316 Md. at 160–165, 557 A.2d at 975–979, we explained that an act of tortious interference with economic relations is characterized by the defendant's specific purpose to interfere, and that acts which incidentally affect another's business relationships are not a sufficient basis for the tort. In particular, the Court declined to hold that the tort would lie wherever an intentional breach of contract would foreseeably impinge upon a contracting party's economic relations with others. 316 Md. at 168–169, 557 A.2d at 980–981.

The Court in *Travelers Indemnity v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 90, *cert. denied*, —— U.S. ——, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992), reiterated that "[f]or one to recover for tortious interference with contractual or economic relations, the interference must have been wrongful or unlawful." We held that an insurance company was not liable for the tort of wrongful or malicious interference when the alleged act of interference constituted the insurer's compliance with a state statute.

Most recently, we held in *Macklin v. Logan, supra*, 334 Md. at 301, 639 A.2d at 119, that malicious interference with economic relations requires "both a tortious intent and improper or wrongful conduct." In particular, the Court emphasized that tortious intent alone, defined as an intent "to harm the plaintiff or to benefit the defendant at the expense of the plaintiff" (*ibid.*), was not sufficient to turn deliberate interference into a tort, but that the defendant must interfere through improper or wrongful means. 334 Md. at 302, 639 A.2d at 119.

■    Therefore, wrongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and "'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *K & K Management v. Lee, supra,* 316 Md. at 166, 557 A.2d at 979, quoting Prosser, *Law of Torts,* § 130, 952–953 (4th ed. 1971).

■    In addition, "actual malice," in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference. *See Willner v. Silverman, supra,* 109 Md. at 357, 71 A. at 964; *Leigh Furniture and Carpet Co. v. Isom, supra,* 657 P.2d at 307; *Miller Chemical Co., Inc. v. Tams,* 211 Neb. 837, 843, 320 N.W.2d 759, 763 (1982); *Alyeska Pipeline Service v. Aurora Air Service,* 604 P.2d 1090, 1094 (Alaska 1979); *Kecko Piping, Inc. v. Town of Monroe,* 172 Conn. 197, 202, 374 A.2d 179, 182 (1977); *Heavener, Ogier Services v. R.W. Fla. Region,* 418 So.2d 1074, 1077 (Fla.App.1982); Prosser, *Law of Torts,* 953 (4th ed. 1971); Restatement (Second) of Torts, § 768, comment g (1977).

Evander has not argued that Alexander's acts of interference were malicious because they were illegal.[19] Neither has it claimed that Alexander's conduct was independently tortious. Evander has based its theory of tortious interference,

---

**19.** In connection with its civil conspiracy claim, Evander argued that Alexander's actions violated Maryland's anti-rebating statute, Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, § 226. Nevertheless, Evander has never argued that the statute is pertinent to establishing that the interference with Evander's contract or economic relations was tortious because it was unlawful. The Court of Special Appeals discussed the statute only in the context of the conspiracy claim. *Alexander v. Evander,* 88 Md.App. 672, 694–703, 596 A.2d 687, 697–702 (1991). The parties have not briefed or argued the issue in this Court. Therefore, we need not explore, in this case, the meaning and scope of the anti-rebating statute.

as well as its claim for punitive damages, on the existence of actual malice allegedly established by statements attributed to Mary Scheeler.

We note that under the circumstances of this case Evander carried a heavy burden in trying to establish the interference tort through proof of actual malice. As explained in *Macklin v. Logan, supra,* 334 Md. at 305–308, 639 A.2d at 121–122, under the broader form of the tort, acts of interference with economic relations do not become tortious simply because the defendant carries them out with a wrongful intent. Proof that Alexander harbored animosity towards Evander when it interfered with Evander's economic relationship with Shand would not sustain the tort if Alexander's animosity was incidental to its pursuit of legitimate commercial goals.

It would appear that Alexander's acts were undertaken pursuant to legitimate commercial goals. Evander, however, suggests otherwise because Alexander influenced decisions at Shand while Shand was a wholly-owned subsidiary of Alexander. In Evander's view, the relationship between Alexander and Shand made Alexander's exercise of influence over Shand particularly objectionable. In fact, that relationship gave Alexander further legitimate reasons for acting as it did. A parent corporation is generally justified in requiring its subsidiary to modify economic arrangements, contractual or otherwise, if those arrangements do not benefit the parent. Under these circumstances, interference by the parent is ordinarily not tortious. *Green v. Interstate United Management Serv. Corp.,* 748 F.2d 827, 831 (3d Cir.1984) (applying Pennsylvania law); *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 702 F.2d 719, 722 (8th Cir.1983) (applying Missouri law); *Bendix Corp. v. Adams,* 610 P.2d 24, 31–32 (Alaska 1980); *Culcal Stylco, Inc. v. Vornado, Inc.,* 26 Cal.App.3d 879, 882, 103 Cal.Rptr. 419, 421 (1972); *Felsen v. Sol Cafe Mfg. Corp.,* 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610, 613–614, 249 N.E.2d 459, 461 (1969); *Conniff v. Dodd, Mead & Co.,* 593 F.Supp. 266, 269 (S.D.N.Y.1984); *James M. King & Assoc. v. G.D. Van Wagenen Co.,* 717 F.Supp. 667, 681 (D.Minn.1989);

*City of Warrensburg, Mo. v. RCA Corp.,* 571 F.Supp. 743, 751 (W.D.Mo.1983). *See United v. Potts & Callahan,* 231 Md. 552, 560, 191 A.2d 570, 574 (1963); Restatement (Second) of Torts, § 769.[20] *See also Juengel Const. Co., Inc. v. Mt. Etna, Inc.,* 622 S.W.2d 510, 516 (Mo.App.1981) (affirming liability based on parent corporation's "arbitrary and whimsical interference" with its subsidiary's contract, and where parent's pecuniary interest was not threatened).[21]

The relationship between Alexander and Shand gave Alexander a direct financial stake in Shand's business relationships with other entities. Alexander was generally justified in directing Shand not to continue relationships that Alexander

---

**20.** Section 769 of the Restatement provides that an entity or individual with a financial interest in another's business does not interfere improperly with that other's economic relationships if the interferer acts lawfully "to protect his interest from being prejudiced by the relation."

Comment e to the section states as follows:

"The rule stated in this Section applies for the purpose of protecting the actor's interest. If his conduct is directed to that end, it is immaterial that he also takes a malicious delight in the harm caused by his action; if his conduct is not so directed and is designed solely for some other aim, such as the gratification of his ill will, he is not entitled to the protection of the rule in this Section."

**21.** It is not clear under Maryland law whether the interference tort lies where the plaintiff's contract or economic relations are with a corporation, and the defendant in the interference action is a controlling officer or stockholder (including parent corporation) of the contracting corporation. Although some jurisdictions have found tortious conduct under these circumstances, they have generally limited tort liability to situations in which the controlling individual or entity acted in bad faith. *See generally* Thomas G. Fischer, *Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another,* 72 A.L.R.4th 492 (1989, 1994 Supp.). Under Maryland law, it could be argued that the analytical framework for the tort, as set out in *K & K Management v. Lee, supra,* 316 Md. at 154–156, 557 A.2d at 973–974, and *Travelers Indemnity v. Merling, supra,* 326 Md. at 343, 605 A.2d at 89–90, does not exist where the entity that controls a corporation is sued for interfering with that corporation's contracts. *See Deauville Corp. v. Federated Dept. Stores, Inc.,* 756 F.2d 1183, 1197 (5th Cir.1985) ("the interests of [parent and subsidiary] are aligned so closely that we have difficulty even recognizing their separate identities for the purpose of this [tortious interference] analysis"). We do not reach this question in the present case.

saw as detrimental to its own long-term financial interests. Provided that Alexander acted to protect these interests, it would not be liable in tort for interfering with Shand's economic relationships even if it harbored an incidental animosity towards Evander.

Even assuming, arguendo, that proof of ill will or spite could sustain the tort under these circumstances, Evander utterly failed to prove such ill will or spite. At the first trial, Mr. Evander was permitted to testify, over hearsay objections, to his recollection of a telephone conversation with Bob Mc-Donald, a Shand executive. During that conversation, McDonald reportedly told Mr. Evander that Mary Scheeler had said that she was going to put Mr. Evander out of business and "that she hates your ass and she's going to get you." The record does not reveal to whom these statements were supposedly made.[22]

Similar testimony admitted at the first trial, but not at the second trial, was elicited from Edna Watterscheidt, Evander's former office manager. Ms. Watterscheidt was permitted to testify at the first trial, again over defense objections, that McDonald had told her "on numerable occasions" that Evander "got the shaft. We were screwed and we were f———." Questioned about what she meant by this testimony, Watterscheidt conceded that McDonald was describing in colorful terms his opinion of the fact that Evander would not get a commission on the OEP premium.

██ Mr. Evander's account of what McDonald allegedly told him that Mary Scheeler had said was hearsay within

---

22. Interestingly, when Mr. Evander was asked at his deposition in 1988 whether or not he had any reason to suspect that Alexander had acted towards him with spite, he had answered "I only know of a remark that came to me second or third hand that Mary Scheeler was going to put me out of business." Pressed to identify the source of the remark, Dixon Evander repeatedly stated that he could not remember it. Nonetheless, at trial in 1990 Mr. Evander confidently traced the comments to the telephone call with McDonald, saying "I remember that conversation quite well."

In deposition testimony introduced as evidence at the first trial, Mr. McDonald denied having made any such remarks to Mr. Evander.

hearsay. Evander argues that this hearsay was improperly excluded at the second trail. Evander contends that it was admissible because it consisted of statements made by Mary Scheeler to her "co-conspirators."

Evander's argument is without merit. The record does not clearly show who was the recipient of Scheeler's alleged statements. Even if we assume that Scheeler made such comments to McDonald himself, there is no evidence that McDonald was involved in any kind of conspiracy to deprive Evander of a commission. On the contrary, Evander's own evidence showed that Shand's employees adamantly supported Evander until Alexander's president told Shand's two top executives that Shand must work with Alexander on Alexander's terms. There is no evidence that McDonald, who was not one of these top executives, ever took any position adverse to Evander's interests. Under the circumstances, there is no basis for Evander's claim that McDonald was a participant in a conspiracy against Evander. Accordingly, even if the hearsay exception for the statements of co-conspirators were otherwise applicable, it cannot help Evander here. *See Daugherty v. Kessler,* 264 Md. 281, 291, 286 A.2d 95, 100 (1972).

Edna Wattenscheidt's testimony does not refer to any statements allegedly made by Scheeler. Instead, Ms. Wattenscheidt testified to what McDonald had told her about his opinion of the denial of commission to Evander. The co-conspirators exception to the hearsay rule simply does not apply to this testimony.[23]

Accordingly, we hold that the trial court correctly excluded all evidence of McDonald's alleged statements from the second trial. In light of the complete absence of other evidence of

---

**23.** Indeed, Evander docs not even attempt in its brief to apply the exception to the Watterscheidt testimony. Neither does it offer any alternative theory of admissibility for the evidence.

malice at the second trial, we can only conclude that the second jury reached its verdict because the court instructed it to find as a fact that Alexander and Scheeler had committed tortious interference with actual malice.[24]

■ Evander's evidence of actual malice at the first trial also consisted of the statements attributed to Mary Scheeler. We have held that the trial court at the first trial erred in admitting that evidence. Thus, at both trials, Evander failed to offer sufficient admissible evidence of actual malice for this issue to have been submitted to either jury.

Evander failed to establish that the defendants' interference with economic relations was wrongful or malicious, and thus failed to prove the existence of tortious conduct. Moreover, even if we were to assume arguendo the existence of tortious conduct, Evander failed to establish the requisite actual malice to support an award of punitive damages.[25]

*JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-MORE CITY UPON THE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES AGAINST ALEXANDER & ALEX-ANDER AND MARY D. SCHEELER REVERSED, AND CASE REMANDED TO THAT COURT WITH INSTRUC-TIONS TO ENTER JUDGMENTS ON THOSE CLAIMS IN FAVOR OF ALEXANDER & ALEXANDER AND MARY D. SCHEELER. PLAINTIFF TO PAY COSTS.*

---

**24.** Evander argues that it introduced further "malicious evidence" in the form of testimony that Scheeler "falsely accused [Mr. Evander] of improperly and unnecessarily collecting a state tax." (Evander's reply brief at 5). While it is true that Evander's trial counsel forcefully suggested to Ms. Scheeler that she had made such accusations, Scheeler repeatedly denied that she had done so. On the contrary, Scheeler explained that her investigation of taxes paid by the hospital in connection with the insurance policies was simply a part of her overall review of her new client's insurance transactions.

Evander has pointed to no testimony or other evidence that Scheeler made accusations against Evander, and we have found none in the record.

**25.** In light of our holding that there was no basis for any award of punitive damages, we need not in this case reach Alexander's alternative arguments that the punitive damages awards were disproportionate to Evander's injury and Alexander's culpability, and that the awards failed to satisfy due process requirements.