**SETTLEMENT SOLUTIONS OF AMERICA, INC., Plaintiff,**

v.

**TRAVELERS INDEMNITY CO., Defendant.**

**No. Civ.A. JFM–98–59.**

United States District Court, D. Maryland.

Nov. 30, 1998.

Francis J. Ford, Michael P. Chervenak, Ford, Chervenak & Foote, Rockville, MD, for plaintiff.

Barry J. Pollack, Miller, Cassidy, Larroca & Lewin, Washington, DC, for defendant.

## MEMORANDUM

MOTZ, Chief Judge.

Settlement Solutions of America, Inc. (Settlement Solutions) has sued Travelers Indemnity Co. (Travelers), alleging tortious interference with contract and tortious interference with an advantageous business relationship. Defendant has filed a motion for summary judgment. Defendant's motion will be granted.

### I.

This is a dispute over commissions from a structured settlement reached in a tort suit filed in Anne Arundel County. In the underlying suit, William Boulay, a minor, sustained serious injuries as a consequence of an accident in a swimming pool at a Holiday Inn hotel. Boulay's parents brought a claim against the hotel and other defendants. The hotel was covered by several insurance policies: Zurich Insurance Company (Zurich) provided coverage for the first $1 million of liability, Westchester Insurance Company (Westchester) provided excess insurance for the next $15 million of liability, and Travelers and the Hartford Insurance Company (Travelers) provided excess insurance for the next $15 million of liability.

Early in the settlement negotiations, Zurich put up its $1 million, and Westchester became actively involved in the negotiations. The parties contemplated a structured settlement, that is, the defendants' insurers would purchase annuities to provide a stream of future payments to the Boulays, rather than paying cash up front. Westchester retained Kurt Wiggins of Ringler & Associates, a structured settlement broker. The Boulays retained Judson N. "Jack" Caddy, president of Settlement Solutions, to act as their structured settlement broker.

Wiggins made inquiries of two annuity providers, American General Life Insurance Company (American General) and Berkshire Hathaway Life Insurance Company (Berkshire Hathaway). Caddy later made inquiries of the same companies. During the course of the negotiations, Wiggins agreed with Caddy that they would work together on putting together a structured settlement, and that they would share the commissions.

The *Boulay* case settled on November 25, 1996 for $20.1 million. Of that amount, $10.5 million was to be paid in cash and $9 .6 million was to be used to purchase annuities with American General and Berkshire Hathaway. Of the $20.1 million, Travelers contributed $700,000. The essential terms of the settlement were placed on the record on that date. There was no mention of a broker for the structured settlement. Caddy obtained and "locked in" quotes from American General and Berkshire Hathaway on November 27, 1996.

On December 4, 1996, Caddy wrote to American General and Berkshire Hathaway, expressing his concern that an insurer for one of the co-defendants might be attempting to fund the annuities through another broker. His letter stated that the annuity providers should not pay commissions to any other broker in the *Boulay* case without first obtaining Caddy's permission.

A formal settlement agreement was signed in the *Boulay* case on December 20, 1996. The agreement obligated Travelers to make monthly payments to the plaintiffs over a period of years. The agreement permitted Travelers to fund its obligation by purchasing annuities from American General and Berkshire Hathaway. There was no mention of a broker in the settlement agreement, nor were Caddy, Settlement Solutions, Wiggins, and Ringler parties to that agreement.

Travelers engaged Smith Barney, one of its affiliates, to act as its broker in purchasing the annuities. Through Smith Barney, Travelers sent the premium payments to purchase the annuities to American General

and Berkshire Hathaway. Although Caddy had "locked in" quotes with both annuity providers earlier than Smith Barney, it is the custom in the annuity industry to pay the 4% commission to whichever broker sends in both an original application *and* the premium payment to purchase the annuities. Berkshire Hathaway paid a commission to Smith Barney. Even though Caddy had not provided the premium payment, he requested that American General send him a commission. American General sent the commission to Caddy, but later realized its error and asked Caddy to return the commission. Caddy returned the entire commission, which was then paid to Smith Barney. Caddy and Ringler subsequently filed a motion to enforce the settlement in order to receive commissions from both annuity providers. That motion was denied by Judge Clayton Greene of the Circuit Court for Anne Arundel County.

Travelers contributed only $700,000 to the settlement. Smith Barney earned a commission of $384,000. An internal memorandum prepared by a Travelers claims representative described the outcome as "a coup."

## II.

Plaintiff argues that defendant tortiously interfered with its contracts with American General and Berkshire Hathaway, thus depriving him of his commission (in the same amount as that paid to Smith Barney). Alternatively, plaintiff argues that defendant is liable for the broader tort of tortious interference with a business relationship.

### A.

To establish tortious interference with a contract, plaintiff must demonstrate five elements: "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Fowler v. Printers II., Inc.,* 89 Md.App. 448, 598 A.2d 794, 802 (Md.Ct.Spec.App.1991). Settlement Solutions alleges that it had contracts with American General and Berkshire

Hathaway to purchase annuities for the Boulay settlement.

It is undisputed that Caddy, president of Settlement Solutions, "locked in" quotes with two annuity providers on November 27, 1996. However, the record establishes that locking-in quotes is not sufficient in the annuity industry to constitute a contractual relationship. In their undisputed deposition testimony, representatives of American General and Berkshire Hathaway explained that it is common for several different brokers to call and obtain quotes regarding the same tort case. Until one of the brokers provides the premium payment, the annuity provider does not know who the broker of record will be. The commission is paid to the broker who submits the application for the commission *and* provides the premium payment. In the *Boulay* case, three brokers called the annuity providers to obtain quotes: Kurt Wiggins of Ringler & Associates (on behalf of Westchester), Jack Caddy of Settlement Solutions (on behalf of the Boulays), and Rick Miller of Smith Barney (on behalf of Travelers). Only Smith Barney ultimately provided the premium payment.

In his deposition, Caddy stated that he understood that the commission would be paid to whoever funded the annuity. He acknowledged that there was a risk that the defendants in the *Boulay* case would decide not to use him as a broker, and that in that event he would not receive the commission. Plaintiff notes that the only thing that prevented it from receiving the $384,000 commission was its inability to provide the premium payments to the annuity providers. That is true; however, plaintiff's failure to provide the premium payment is precisely what prevented the contract from being formed. If every broker who obtained a quote from the annuity companies thereby entered into a contractual relationship, there would be three brokers due a commission in this case. That cannot logically be. Based on the custom of the annuity industry, it is clear that there were no contracts between Settlement Solutions and the annuity providers.

## B.

Plaintiff next argues that even if plaintiff had no contract with American General or Berkshire Hathaway, Travelers wrongfully interfered with its prospective contracts with them. Tortious interference with prospective business relations requires: "(1) [I]ntentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *K & K Management Inc. v. Lee*, 316 Md. 137, 557 A.2d 965, 973 (Md.1989).

■ Maryland courts have made clear that "acting to pursue one's own business interests at the expense of others is not, in itself, tortious." *Alexander & Alexander, Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 650 A.2d 260, 269 (Md.1994). Therefore, tortious interference with business relations requires "conduct that is independently wrongful or unlawful, quite apart from its effect on business relationships." *Id.* at 271. Wrongful acts include "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *K & K Management*, 557 A.2d at 979. Here, plaintiff has not alleged any wrongful conduct other than defendant's having prevented plaintiff from collecting a commission on the *Boulay* case.

Plaintiff seems to be arguing that Travelers breached its alleged agreement with Caddy and Settlement Solutions to allow Caddy to broker the settlement. That claim would have to be brought under a breach of contract or quasi-contract cause of action, not under the tortious interference with contract/business relations claims that plaintiff has pleaded. Plaintiff attempted to bring such a suit with its motion to enforce the settlement in the *Boulay* case. That motion was denied because plaintiff was not a party to that settlement. In fact, the record establishes Kevin McCarthy, the Boulays' attorney, knew at the time the settlement papers were signed that Travelers intended to se-

cure the commission for the *Boulay* settlement. McCarthy said that his clients wanted the commission to go to Caddy, but that it was "a collateral issue," not important enough to hold up the settlement.

It seems somewhat unfair that Caddy will not receive at least a partial commission. The record reflects that he did perform work, for which he will not be compensated, in locking in the commissions from American General and Berkshire Hathaway before Smith Barney entered the picture. Although the outcome from Travelers' perspective was aptly described by one of its claims agents as "a coup," from Caddy's point of view the result is decidedly inequitable. However, Caddy has voluntarily chosen his own line of work, and he is subject to the risks of his profession. One might wish the mind and the mores of the insurance industry to be different, but they are what they are, and under Maryland law more than a pursuit of self-interest is necessary to sustain a tortious interference with business relations claim.

## ORDER

ORDERED that defendant's motion for summary judgment is granted.