743 A.2d 247

Judith A. GEDULDIG, et al.

v.

David B. POSNER, et al.

No. 497, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Dec. 29, 1999.

Kurt J. Fischer (Shale D. Stiller, Brett Ingerman and Piper & Marbury L.L.P. on the brief), Baltimore, for appellants.

Peter E. Keith (Gallagher, Evelius & Jones, LLP, Baltimore, E. Pete Summerfield, Alan H. Silverberg and Summerfield, Willen, Silverberg & Limsky, P.A., Owings Mills, on the brief), for appellees.

Argued before SALMON, EYLER, and SONNER, JJ.

EYLER, Judge.

In these two consolidated actions, based on claims of undue influence and fraud, claimants seek to (1) set aside a will and a revocable trust, (2) impose a constructive trust, and (3) be awarded compensatory and punitive damages. The question is whether the evidence is legally sufficient to create a fact question and thereby avoid summary judgment in favor of the defendants. We answer that question in the affirmative and, consequently, reverse the judgment of the circuit court. For the benefit of the court on remand, we shall discuss whether Maryland recognizes the tort of intentional interference with expected inheritance and shall conclude that the tort is not available on the facts of these cases.

## Introduction

Nathan Posner and Rose Posner (Ms. Posner) were married and had three children: David P. Posner (Dr. Posner), appellee, Judith A. Geduldig (Ms. Geduldig), and Carol Jean Posner Gordon (Dr. Gordon), appellants. Nathan Posner died testate, but the terms of his will are not relevant except to observe that it contained a marital trust ("marital trust").

Ms. Posner died on October 28, 1996, leaving a will and revocable trust, both dated January 3, 1996. In the will,[1] she (1) expressly revoked "all" prior wills, (2) named Dr. Posner as personal representative of her estate, (3) bequeathed a picture to Dr. Gordon, (4) bequeathed $100 to Ms. Geduldig, and (5) bequeathed the residue of her estate, including the marital trust assets pursuant to a power of appointment, to Dr. Posner as trustee of the revocable trust. In the revocable trust, in pertinent part, Ms. Posner provided that, upon her death, the assets would be distributed as follows: (1) $2,500,-000 to Dr. Posner, (2) $80,000 to his spouse, (3) $2,500,000 to

---

1.  In our discussion of this and various other wills, we will not describe the terms of each instrument in detail but will only describe the provisions pertinent to the issues.

certain named charitable organizations, (4) $100,000 in trust for the benefit of Ruth Browne, Ms. Posner's sister, (5) $10,000 to Ms. Posner's friends, Barry Webb and Zoe Webb, (6) $1,000,000 in trust for the benefit of Dr. Posner's children, (7) $100 to Dr. Gordon, (8) $100 to Ms. Geduldig, and (9) the residue to Dr. Posner, including the balance of funds, if any, in the trust, for Ms. Browne and Dr. Posner's children after compliance with the terms of the trusts.

Ms. Geduldig and Dr. Gordon took the position that Ms. Posner did not have a testamentary power of appointment with respect to the marital trust. They filed a declaratory judgment action in the Circuit Court for Baltimore County, and the circuit court agreed. The case came to this Court on appeal, and we held that Nathan Posner's will did not grant Ms. Posner a testamentary power of appointment over the assets of the marital trust. Consequently, we affirmed the judgment of the circuit court. *Posner v. McDonagh*, No. 1574, September Term, 1997 (filed March 11, 1999). The effect of that ruling, according to a pleading in the record before us, was that the assets in the marital trust passed under Nathan Posner's will, in equal shares, to the three children.

On December 24, 1996, Dr. Gordon and Ms. Geduldig filed a petition for caveat in the Circuit Court for Baltimore County, alleging that Ms. Posner's will, with respect to bequests to Dr. Posner, was the product of undue influence and fraud exercised by Dr. Posner. On July 1, 1997, the Orphans Court transferred the case to the Circuit Court for Baltimore County.

On April 28, 1998, Dr. Gordon and Ms. Geduldig filed a complaint in the Circuit Court for Baltimore County against Dr. Posner, his spouse, Nancy Posner, their four children, Jonathan, Melissa, Stephen, and Aleza Posner, and Ruth Browne (additional appellees, hereinafter collectively "Dr. Posner"), seeking a declaratory judgment that Dr. Posner had engaged in fraud and undue influence. Dr. Gordon and Ms. Geduldig alleged tortious interference with their expected inheritance, in addition to independent claims of fraud and

undue influence. Dr. Gordon and Ms. Geduldig claimed that the revocable trust was a product of the fraud and undue influence and requested compensatory damages, punitive damages, and the imposition of a constructive trust on assets distributable under the trust.

On October 26, 1998, the two actions were consolidated. Dr. Posner filed a motion for summary judgment on the ground that (1) there was no legally sufficient evidence of undue influence and fraud because there was no evidence that force or coercion had been exercised upon Ms. Posner; (2) tortious interference with expected inheritance is not recognized as a tort in Maryland; and (3) there was no evidence of expectation of an inheritance. The circuit court, by memorandum opinion and order dated May 6, 1999, granted the motions. The court found that there was no evidence of undue influence because of the absence of any evidence that Ms. Posner was susceptible to any influence or false statements and further found that there was no evidence that fraudulent statements, if any, had any causative effect on Ms. Posner's distribution of assets.

### Facts

On July 11, 1985, Ms. Posner executed a will revoking "all" prior wills, in which she (1) named Dr. Posner and James P. McDonagh, a friend of the family, as personal representatives, (2) bequeathed $100 to Ms. Geduldig and each of her surviving children, and (3) bequeathed the residue of her estate, in equal shares, to Dr. Posner and Dr. Gordon. Ms. Posner and Ms. Geduldig were estranged at that time. On October 9, 1985, Ms. Posner executed a codicil to the "Last Will and Testament dated July 11, 1985," in which she purported to exercise a power of appointment over the assets of the marital trust created under Nathan Posner's will. She appointed the assets, in equal shares, to Dr. Posner and Dr. Gordon. On that same day, Ms. Posner made *inter vivos* gifts of $750,000 each to Dr. Posner and Dr. Gordon.

On February 13, 1986, Ms. Posner executed a will in which she revoked all prior wills and (1) named Dr. Posner and Mr.

McDonagh as personal representatives, (2) bequeathed $100 to Ms. Geduldig and each of her surviving children, and (3) bequeathed the residue of her estate, including the marital trust assets, to Dr. Posner and Dr. Gordon, in equal shares. According to an affidavit filed by Dr. Gordon, a psychiatrist, Ms. Posner, in later life, "suffered from emphysema, heart disease, insomnia, and other physical ailments. Her physical condition became progressively worse during the 1980's, and she eventually was required to use an oxygen dispenser continuously to assist her in breathing." According to the same affidavit, Ms. Posner suffered from depression after Nathan Posner's death and from time to time thereafter. She also chronically suffered from shortness of breath.

Dr. Gordon testified in her deposition that she began treating Ms. Posner in 1988 for depression, anxiety, and insomnia. She prescribed Klonopin, Prozac, and subsequently, BuSpar.[2] This alleviated Ms. Posner's anxiety and shortness of breath.

On October 14, 1990, Ms. Posner executed a will, revoking "all" prior wills. Ms. Posner (1) named Dr. Posner and Mr. McDonagh as personal representatives and Dr. Posner as trustee, (2) bequeathed $100 to Ms. Geduldig and each of her surviving children, (3) bequeathed $1,000,000 in trust for the benefit of Dr. Posner's children, and (4) bequeathed one half of the residuary estate, including the marital trust assets, to Dr. Posner and the other half to Dr. Posner as trustee for the benefit of Dr. Gordon. The income of the trust was to be paid to Dr. Gordon during her lifetime and the principal to Dr. Posner's children upon Dr. Gordon's death. Dr. Gordon was given a right to invade principal to provide for her health care and in the event of poverty.

This was the first of Ms. Posner's wills that was prepared by Mark Willen, an attorney retained for that purpose. Mr. Willen, in his deposition, testified that he had been represent-

---

2. Klonopin is an anti-convulsant drug.. Prozac is an anti-depressant drug. BuSpar is an anti-anxiety drug.

ing Dr. Posner for 15 to 18 years and that Dr. Posner introduced him to Ms. Posner.

On December 25, 1993, Ms. Posner became ill while in Florida. Dr. Gordon visited her, determined that the medical care she was receiving was inadequate, and arranged for Ms. Posner to be transferred to Lankenau Hospital in Philadelphia, where she came under the care of Ms. Posner's brother, Laurence T. Browne, an internist. On February 4, 1994, Ms. Posner was discharged to the Devon Manor Nursing Home in Philadelphia, where she remained under Dr. Browne's care.

Dr. Browne, in his deposition, testified that, during that time period, he became concerned with respect to the estrangement between Ms. Posner and Ms. Geduldig. He arranged for Ms. Geduldig and her children to visit Ms. Posner at Devon Manor, and the family members reconciled. He further testified that both Ms. Geduldig and Dr. Gordon visited on several occasions in the winter and spring of 1994.

Following the reconciliation, according to Dr. Browne, Ms. Posner told him that she wanted to treat her three children equally. On February 6, 1994, Ms. Posner executed a will revoking "all" prior wills, in which she named Dr. Posner, Dr. Gordon, and Mr. McDonagh as personal representatives and bequeathed the residue of her estate and the marital trust assets to the three children, in equal shares. The record does not reflect who prepared that will, but it was not prepared by Mark Willen. It appears to have been executed in Pennsylvania.

Dr. Browne, in his deposition, testified that as a result of Ms. Posner's serious illness that began in December, 1993, she was unable to handle her financial affairs, and her sister, Ms. Browne, assumed responsibility. He further testified that she did not do a good job and that Ms. Posner asked him, Dr. Browne, to assume that responsibility. On April 2, 1994, Ms. Posner executed a power of attorney, pursuant to which she granted Dr. Browne authority to manage her financial affairs. On April 7, 1994, Ms. Posner executed a "first codicil to [her] last will and testament dated October 14, 1990." In this

codicil, in part, Ms. Posner bequeathed her residuary estate, including the marital trust assets, to her three children, in equal shares.

In his deposition, Dr. Browne testified that when Dr. Posner learned that Ms. Posner had granted a power of attorney to Dr. Browne, Dr. Posner became very angry. He stated that Dr. Posner's visits to Ms. Posner "increased exponentially," and he called Ms. Posner on the phone more frequently after learning of the existence of the power of attorney. Dr. Browne testified that Ms. Posner described the phone calls as "angry, threatening, [and] very disturbing to [her]." Ms. Posner was upset by Dr. Posner's visits, which, according to Dr. Browne, caused a recurrence of shortness of breath, cardiac irregularity, and mental confusion.

Sometime between March and early May, Mr. Willen prepared what was described as a "first codicil" to Ms. Posner's "last will and testament dated October 14, 1990." Under this codicil, the residue of the estate and the marital trust was to be distributed in equal shares to the three children, except that, similar to the 1990 will, Dr. Gordon's share was to be distributed to Dr. Posner as trustee to be held in trust for her benefit during her lifetime, and upon her death, the remaining principal was to be distributed to Dr. Posner's children. This codicil was never fully executed. Dr. Posner, in his deposition, testified that, when it was presented to Ms. Posner, either he or Ms. Posner, and he was not sure who, suggested that Dr. Gordon's share should be distributed to her outright instead of in trust.

On May 8, 1994, Ms. Posner executed a will, prepared by Mr. Willen, that, in its entirety, revoked

THE LAST WILL SIGNED BY ME ON OR ABOUT APRIL 2, 1994, AND DO DECLARE THAT THE ACCU-RATE, OPERATIVE, AND CURRENT WILL THAT IS TO BE IN EFFECT IS TO BE THE ONE WRITTEN BY MY ATTORNEY, MARK WILLEN, ESQ., AND DATED AND SIGNED BY ME ON OCTOBER 14, 1990. THE ONLY ADDITION TO THIS ACCURATE AND EFFEC-

TIVE WILL IS THE CODICIL WRITTEN BY MY AT-
TORNEY, MARK WILLEN, ESQ., IN MARCH, 1994,
AND SIGNED BY ME, WITH MODIFICATION, DATED
MAY 7, 1994.

On May 11, 1994, Ms. Posner executed another will, pre-
pared by Mr. Willen. In that will, revoking "all" prior wills,
Ms. Posner named Dr. Posner and Mr. McDonagh personal
representatives and Dr. Posner trustee, created a $1,000,000
trust fund for the benefit of Dr. Posner's children, and ap-
pointed the marital trust assets to the three children, in equal
shares. She further bequeathed her residuary estate to the
three children, in equal shares, but provided that, if Ms.
Geduldig or Dr. Gordon predeceased her, their shares should
be distributed to Dr. Posner, as trustee, to be used for the
benefit of Dr. Posner's children. Also on May 11, Ms. Posner
revoked the power of attorney previously granted to Dr.
Browne and granted a power of attorney to Dr. Posner. That
document was also prepared by Mr. Willen.

In the April–to–May time frame, according to Dr. Gordon
and Ms. Geduldig, Dr. Posner and Ms. Browne were planning
to remove Ms. Posner from Devon Manor without telling Dr.
Browne of their intent to do so. Dr. Browne learned about it
and was concerned about Ms. Posner's health and well being.
Dr. Browne testified that, because of his concern for Ms.
Posner's health and his concern that her removal was not
related to her welfare, he, Dr. Gordon, and Ms. Geduldig, filed
a complaint in the Court of Common Pleas for Chester
County, Pennsylvania. The action was filed against Dr. Pos-
ner, Ms. Browne, and Ms. Posner, and sought a temporary
restraining order and preliminary injunction to prevent Ms.
Posner's removal from Devon Manor. On May 12, 1994, the
Court of Common Pleas issued a temporary restraining order.

Dr. Browne, in his deposition, testified that, after Ms.
Posner executed the May 11 will and the May 11 power of
attorney, he discussed her financial situation and her estate
with her. He testified that she told him that she wanted to
stay at Devon Manor and that she also wanted to treat her

three children equally. Dr. Browne had prepared a will and a power of attorney, the latter authorizing him to handle her financial affairs. Ms. Posner signed both of those documents on May 16, 1994. In the will, in part, Ms. Posner bequeathed the residue of her estate, including appointment of the marital trust assets, to her children, in equal shares.

Again referring to Dr. Browne's deposition, Dr. Browne testified that Ms. Posner informed him that she had been informed that there was a conspiracy to get control of her assets and to keep her imprisoned in Devon Manor. In pertinent part, he testified as follows:

Q. Dr. Browne, could you read the notation that you made in your progress note on May 17th, 1994 regarding Dr. David Posner's statements to Rose?

A. Well, this is a progress note made as indicated at 1800 hours by me and it reads like this: Agitated, hostile, dyspneic, sweating and emotionally distressed by recent visit of son and lawyer dash telling patient, quote, conspiracy and, quote, unquote, guarding here. Told patient of explanations and Bill, Jean, Judi, Dawn and Dan who were there tried to contribute to her reassurance and hopes for getting better.

She had sternal retractions. Her respiration rate was 30. Her blood pressure was 100 and 50 slash 80. Her ventricular rate was 120 and irregular. Her chest revealed a few wheezes. And rhonchi, there was dullness in the left base. The skin was sweaty and the abdomen showed modest distension.

Mentally, she was confused, the reason, the conspirators and guarding—the conspiracy and guarding. And now she knows what it is all about. But, quotes, but she wants to be left alone, unquote.

On May 18, Ms. Posner was examined by Dr. Bruce Bogdanoff, a neurologist practicing in Pennsylvania, who concluded that Ms. Posner's intermittent cognitive and behavioral problems were related to cerebral hypoxia, resulting from her lung and heart disease. He also stated in his report that family

problems could have contributed to her ailments. He noted that Ms. Posner was alert, oriented, with no definite signs of dementia. Dr. Bogdanoff saw Ms. Posner, accompanied by Dr. Gordon, in consultation in his office, apparently located near Philadelphia. Dr. Bogdanoff wrote in his report that Ms. Posner had a history of depression, had taken Prozac in the past, and was then taking BuSpar, Klonopin, and other medications that we cannot decipher from the report.

On May 24, in the action seeking injunctive relief, a judge of the Court of Common Pleas interviewed Ms. Posner. The transcript of that interview indicates that Ms. Posner expressed an awareness that there were two groups within her family who disagreed with respect to her welfare. She described Dr. Browne, Dr. Gordon, and Ms. Geduldig as constituting one group and Dr. Posner as the other group. She stated that she wanted to treat them all equally. We note, however, that it is not clear to us from the transcript whether, when she made that statement, she was referring to distribution of assets or general familial relationships. Ms. Posner also indicated in the interview that she wanted to remain at Devon Manor and that she was happy with Dr. Browne.

Dr. Browne, apparently in May, had counsel prepare a petition to be filed in the Court of Common Pleas, seeking his appointment as limited guardian for Ms. Posner, based on an alleged partial physical incapacity to handle her financial affairs. Pennsylvania counsel for Dr. Posner wrote a letter dated May 27, 1994, to Dr. Browne's counsel stating that there was no need to file such a petition, and that Dr. Posner had agreed not to move Ms. Posner until June 3 in order to provide time to work out an agreement. It is not clear from the record when the petition was filed.

On May 31, Dr. Posner's immediate family and friends moved Ms. Posner to Mercy Hospital in Baltimore. Dr. Posner, a gastroenterologist, practiced at Mercy Hospital. Dr. Posner, in his deposition, testified that this was done without his knowledge.

Also on May 31, Ms. Posner executed another codicil, also prepared by Mr. Willen. The codicil recited that it was a codicil to her May 11, 1994, will and expressly revoked "any and all prior wills as well as my Will dated May 16, 1994." The codicil made a few changes to the May 11 will, including bequeathing $20,000 to Ms. Browne, $250,000 to a grandson, Daniel Geduldig, and disinheriting Ms. Geduldig's remaining children "for reasons known to them." [3]

On July 10, 1994, Ms. Posner executed another will, prepared by Mr. Willen. The will revoked "all" prior wills and named Dr. Posner and Mr. McDonagh as personal representatives and Dr. Posner as trustee. Pursuant to the terms of that will, Ms. Posner reduced the inheritance of Dr. Gordon and Ms. Geduldig by $25,000 each and provided that such sums should go to a named charitable organization. The will explained that she did this because she believed that they had attempted to have her declared incompetent. The will recited that she was "deeply hurt and outraged" by the actions. It further recited that she reduced the inheritance "to not only receive damages for my aggravation, unnecessary stress and difficulties, the legal fees and related expenses, but also as a punitive measure which I feel I must express." The will bequeathed $20,000 to Ms. Browne, $250,000 to Daniel Geduldig, $1,000,000 in trust for the benefit of Dr. Posner's children, and the residue, including the marital trust assets, to the three children, in equal shares, reduced by $25,000 each as mentioned above.

Ms. Geduldig and Dr. Gordon assert that Dr. Posner told Ms. Posner that the daughters had attempted to have her declared incompetent and that this statement was untrue. We have not found any direct evidence that he made that statement to her. Dr. Posner did testify in his deposition, however, that he made that statement to Ms. Posner's doctors at Mercy Hospital. He also testified that he had conversations with Ms. Posner concerning the actions by the daughters, and

---

3. The record does not reveal whether Ms. Geduldig had other children, and if so, how many.

that these conversations occurred in the summer of 1994. It is unclear whether Ms. Posner brought up the subject and he responded and agreed that the daughters had taken action against her, including a scheme to over-medicate her, or whether he was the first one to make such statements to her.

On September 12, 1994, Dr. Posner filed a complaint with the Pennsylvania Board of Medicine against Dr. Browne. In that complaint, he alleged that Dr. Browne had prescribed medication to Ms. Posner in doses calculated to cause confusion in order to gain control over her assets and to keep her in Devon Manor. There is evidence that many of the medicines and doses being prescribed by Dr. Browne were at the suggestion of and as recommended by Dr. Gordon, and that at some point Ms. Posner was aware of that.

Dr. Posner, in his deposition, testified that he had received information from the physicians at Mercy Hospital, after Ms. Posner arrived there, indicating that Dr. Browne had over-medicated her. As stated, it is not clear whether Dr. Posner first advised Ms. Posner, but in any event, he did discuss the situation with her. He suggests in his deposition that she complained and wanted to file a malpractice action against Dr. Browne. He stated that he filed the complaint with the State licensing authority in lieu of the malpractice action that she wanted to file.

Dr. Gordon, in her deposition, testified that Ms. Posner told her that Dr. Posner had advised Ms. Posner that she, Dr. Gordon, was "a thief and a burglar." Dr. Gordon testified that the underlying basis was that she had removed some items from her mother's home for safekeeping while she was away. Apparently, she returned the items after being challenged.

On February 2, 1995, Ms. Posner executed a will prepared by Mr. Willen. In that will, revoking "all" prior wills, she named Dr. Posner and Mr. McDonagh as personal representatives and Dr. Posner trustee. She bequeathed $250,000 to Daniel Geduldig, $1,000,000 in trust for the benefit of Dr. Posner's children, appointed the marital trust assets to the

three children in equal shares, and the residue of the estate to Dr. Posner.

In 1995, Dr. Gordon gave Ms. Posner a picture of Dr. Gordon and her father, Nathan Posner, taken at Dr. Gordon's graduation from medical school. Subsequently, while visiting Ms. Posner in her apartment, Dr. Gordon noticed that the picture had been placed where it could not be seen. Dr. Gordon asserts that it was placed there by Dr. Posner, but we find no evidence of that other than her assumption. Dr. Gordon indicated that she was hurt by the placement of the picture and removed the picture from Ms. Posner's home. Subsequently, Ms. Posner, represented by Mr. Willen, filed an action in the District Court of Maryland for Baltimore County to recover the picture. Dr. Gordon returned the photograph, and the suit was dismissed prior to trial. Appellants assert that this suit was filed at the suggestion of Dr. Posner, but we find no direct evidence of that fact.

On January 3, 1996, Ms. Posner executed the will and revocable trust described in the beginning of this opinion.

Dr. Posner, in his brief, points to testimony by several witnesses describing Ms. Posner as strong-minded, independent, intelligent, knowledgeable, determined, opinionated, and sharp. There is evidence indicating that the relationship between Ms. Posner and Ms. Geduldig was strained and that they spoke only once from 1975 to 1994. They reconciled in 1994, but appellees assert that the relationship subsequently deteriorated. James McDonagh testified, in his deposition, that Ms. Posner told him in the summer of 1996 that she was very upset with her daughters because they stopped visiting her in August, 1995. Delores Kennedy, one of Ms. Posner's private nurses, and Dr. Browne, both testified that Ms. Posner had stated that she disliked Dr. Gordon's husband. There is also evidence that Ms. Posner was angry with Dr. Gordon with respect to the photograph and for removing personalty from her apartment, and she was angry with both daughters because of the actions filed in Pennsylvania.

Finally, the record contains two videotapes of Ms. Posner. The first depicts the execution of the will and trust on January 3, 1996, and the second depicts the re-execution of those documents on March 8, 1996.

We will reference the above plus additional evidence in our discussion of the issues.

## Standard of Review

The primary issue before us is whether the circuit court erred in granting summary judgment in favor of Dr. Posner. Maryland Rule 2–501(e) provides that a court may grant a motion for summary judgment "in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In considering a motion for summary judgment, the trial court does not determine any disputed facts, but instead rules on the motion as a matter of law. *See Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993); *White v. Friel,* 210 Md. 274, 285, 123 A.2d 303 (1956). The court views the facts, including all inferences, in the light most favorable to the party against whom the court grants the judgment. *See Beard v. American Agency Life Ins. Co.,* 314 Md. 235, 246, 550 A.2d 677 (1988).

## Discussion

### I.

■ Ms. Geduldig and Dr. Gordon contend that tortious interference with expected inheritance is a viable cause of action in Maryland. They acknowledge that it requires proof of intentional misconduct, such as undue influence or fraud, and assert that such evidence exists in this case.

Ms. Geduldig and Dr. Gordon, acknowledging that Dr. Posner argued below that it is not a viable cause of action, assert that the circuit court did not reach that issue. Dr. Posner, on the other hand, contends that the circuit court

addressed the issue and held that it is not a viable tort in Maryland. Dr. Posner urges that same position on appeal.

Before discussing the merits of the issue, we will briefly restate the claims. In the petition to caveat, Ms. Geduldig and Dr. Gordon alleged that the January 3, 1996, will was procured by the exercise of undue influence and fraud upon Ms. Posner.

In the complaint filed in the Circuit Court for Baltimore County, Ms. Geduldig and Dr. Gordon alleged tortious interference with expected inheritance by fraud, tortious interference with expected inheritance by undue influence, fraud, and undue influence. They alleged in all counts that the revocable trust was a product of the misconduct. Ms. Geduldig and Dr. Gordon further alleged that the will caveat proceeding did not provide an adequate remedy because, prior to her death, Ms. Posner transferred substantially all of her assets to the revocable trust. Ms. Geduldig and Dr. Gordon sought to impose a constructive trust on the revocable trust assets and to be awarded compensatory and punitive damages against Dr. Posner.

Our reading of the circuit court opinion is that it did not purport to predict whether the tort in question would be recognized in Maryland but, rather, held that the evidence was legally insufficient in any event. We reverse on that basis but will also discuss the viability of the tort because the issue is likely to arise on remand. *See* Md. Rule 8–131.

We now turn to the merits. Tortious interference with expected inheritance is described in the RESTATEMENT (SECOND) OF TORTS § 774B (1965) as follows: "One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift." The tort has been recognized in other jurisdictions. *See, e.g., Wickert v. Burggraf,* 214 Wis.2d 426, 570 N.W.2d 889 (App.1997) (tortious interference action by a plaintiff claiming the defendants improperly influenced plaintiff's grandmother to revoke a will

in which assets were bequeathed to plaintiff); *DeWitt v. Duce,* 408 So.2d 216 (Fla.1981)(tortious interference action is allowable only when inadequacy of probate remedies is apparent or established); *Barone v. Barone,* 170 W.Va. 407, 294 S.E.2d 260 (1982) (recognizes tortious interference with a testamentary bequest). The elements of the tort, as explained by the New Mexico Court of Appeals, are as follows:

> To recover for tortious interference with an expected inheritance, a plaintiff must prove the following elements: (1) the existence of an expectancy; (2) a reasonable certainty that the expectancy would have been realized, but for the interference; (3) intentional interference with that expectancy; (4) tortious conduct involved with interference, such as fraud, duress, or undue influence; and (5) damages.

*Doughty v. Morris,* 117 N.M. 284, 871 P.2d 380 (Ct.App.1994).

In *Anderson v. Meadowcroft,* 339 Md. 218, 661 A.2d 726 (1995), the Court of Appeals had occasion to discuss the tort in question. In that case, the circuit court granted defendant's motion to dismiss. The Court of Appeals neither accepted nor rejected the tort and expressly stated that it did not need to decide that issue because the complaint did not adequately allege undue influence, the underlying alleged misconduct.

As noted by the Court of Appeals in *Anderson,* 339 Md. at 222, 661 A.2d 726, some jurisdictions recognize the tort in a will context in limited circumstances, *e.g.,* after exhaustion of probate proceedings or a showing that the remedy is not adequate, or do not recognize it at all if an opportunity existed to seek a remedy in probate proceedings and that opportunity was not taken. *See DeWitt,* 408 So.2d 216. Other jurisdictions recognize the tort as a concurrent remedy, regardless of whether a will or an *inter vivos* transfer is being attacked. *See Cyr v. Cote,* 396 A.2d 1013 (Me.1979).

The Court of Appeals has long recognized the tort of intentional interference with contract or with other economic relations in a commercial context. The Court of Appeals has required, however, unlike some jurisdictions, not only that there be a specific purpose to interfere, but that the conduct

be independently wrongful or unlawful. *Alexander & Alexander v. B. Dixon Evander & Associates,* 336 Md. 635, 657, 650 A.2d 260 (1994). The Court, in *Alexander,* stated that the tort has never been interpreted in such a way as to turn a breach of contract action into an intentional tort to permit recovery for pecuniary loss, consequential loss, emotional distress, actual harm to reputation, and in appropriate circumstances, punitive damages. 336 Md. at 654, 650 A.2d 260.

RESTATEMENT (SECOND), OF TORTS § 774A discusses damages available in an action for interference with contract or a prospective contractual relation. It provides for the recovery of pecuniary loss from the relation, consequential losses caused by the interference, emotional distress or actual harm to reputation if reasonably to be expected to result from the interference and, in appropriate circumstances, punitive damages. The RESTATEMENT position was adopted by the Court of Appeals in *Rite Aid Corporation v. Lake Shore Investors,* 298 Md. 611, 620, 471 A.2d 735 (1984).

RESTATEMENT § 774B, quoted above, discusses interference with other forms of economic relations. The RESTATEMENT indicates that the interference must be by a means that is independently tortious, unlike an interference with contract or a prospective contractual relation that, at least in some jurisdictions, is not required. As we have seen, there must be conduct independently tortious in the commercial form of the tort in Maryland. *See Alexander & Alexander,* 336 Md. at 658, 650 A.2d 260.

The RESTATEMENT does not contain a separate section on damages available as a result of interference with other forms of economic relations, but § 774B does contain a reference to § 774A. Additionally, at least one court, the Texas Civil Court of Appeals, has stated that the damages available under § 774B are the same as the damages discussed in § 774A. *See King v. Acker,* 725 S.W.2d 750, 754 (1987).

Traditionally, claims attacking the distribution of estate and trust assets based on undue influence and fraud were equitable actions. Equity courts could award pecuniary relief if necessary to accomplish complete relief (*e.g.,* when dissipation

of assets prevented the traditional equitable remedy). But these decisions were in the context of traditional equitable remedies such as rescission, specific performance, injunctive relief, constructive trusts, and the like. Equity courts did not award compensatory damages for emotional distress and harm to reputation nor punitive damages.

In actions to set aside wills or trusts, equity focused on rectifying a situation wherein the testator or the settlor was not able to dispose of his or her estate freely and did not focus on harm to those who were left out. The correction of that harm was a result of righting the wrong to the testator or settlor. The premise of the equitable action was that a person should be free to determine his or her distribution of assets.

In this context, we discuss *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997). In *Kann*, the Court of Appeals refused to recognize a generic cause of action at law for breach of fiduciary duty. The issue was discussed, primarily, in the context of a right to jury trial. The Court of Appeals observed that, historically, the supervision of trusts was within the province of equitable courts, which included claims by beneficiaries against trustees. The Court opined that recognition of such an action at law would enlarge damages liability, including the potential for punitive damages, not available in equity. The Court concluded that it

> . . . .would not preside over the death of contract by recognizing as a tort a breach of contract that was found to be in bad faith. *See K & K Management, Inc. v. Lee*, 316 Md. 137, 169, 557 A.2d 965, 980–81 (1989); *Alexander & Alexander, Inc. v. B. Dixon Evander & Associates*, 336 Md. 635, 654, 650 A.2d 260, 269–70 (1994) ('[T]his Court has refused to adopt any theory of tortious interference with contract or with economic relations that transforms a breach of contract claim into an intentional tort.') Nor shall we preside over the death of equity by adopting [appellants'] contentions.

344 Md. at 713, 690 A.2d 509.

Synthesizing the above, we conclude that the Court of Appeals would recognize the tort if it were necessary to afford

complete, but traditional, relief. In the case before us, no reason is given as to why recognition of the tort is necessary other than that damages are sought which are not otherwise available, specifically, damages for emotional distress, harm to reputation, and punitive damages. We decline to recognize the tort where the sole reason is an expansion of traditional remedies, as opposed to a situation, not before us, where the traditional remedy might be insufficient to correct the pecuniary loss. The question of viability and application of the tort depends on the facts in a given case.

In the case before us, the claims under the tort counts are duplicative of the independent claims based on fraud and undue influence, except for the damage claim that would constitute an expansion of existing law.[4] Based on the rationale articulated in *Kann*, we decline to recognize the tort in this instance.

## II.

Ms. Geduldig and Dr. Gordon contend that there is legally sufficient evidence of undue influence to create a triable issue. The essence of the claim is that Dr. Posner made false statements to Ms. Posner with respect to Ms. Geduldig and Dr. Gordon, including statements that they conspired to over-medicate Ms. Posner and to seize her assets. Ms. Geduldig and Dr. Gordon assert that fraud was one of the ways that undue influence was exercised in addition to asserting fraud as an independent ground for relief.

Dr. Posner, in essence, argues that there is no legally sufficient evidence of force or coercion, a necessary element

---

4. At oral argument, appellants argued that, because they were not asserting that the $2,500,000 in charitable bequests were caused by the alleged fraud and undue influence, but were asserting entitlement to a fraction of the entire estate, a damage award would be necessary and a constructive trust would be an inadequate remedy. We fail to see how appellants would be entitled to a portion of the $2,500,000 in the absence of any evidence that those bequests were caused by any misconduct. In other words, if appellants prevail, they can reach only those assets affected by the fraud and undue influence.

for undue influence, and no direct evidence of fraud or undue influence. Dr. Posner also makes repeated references to two videotapes. The first videotape depicts Ms. Posner executing her will and revocable trust on January 3, 1996, and the second videotape depicts the re-execution of those documents on March 8, 1996. Dr. Posner asserts that the videotapes demonstrate that Ms. Posner knew what she was doing and that no force was used.

Dr. Posner also points to evidence in the record describing Ms. Posner as being intelligent, strong-willed, and other similar adjectives. Dr. Posner points out that the January 3, 1996, will and trust were prepared by an attorney representing Ms. Posner and that the disposition of assets is explainable (1) by the estrangement between Ms. Posner and Ms. Geduldig, (2) Ms. Posner's anger at Dr. Gordon because of the photograph incident, (3) the fact that Dr. Gordon took some items from her apartment, (4) the fact that Ms. Geduldig and Dr. Gordon participated in filing a court action seeking to have Ms. Posner declared incapable of handling her affairs, and (5) the positive relationship between Ms. Posner and Dr. Posner.

The circuit court's ruling was on a narrow ground. The court stated:

> This court does not feel that physical ailments alone are sufficient as a matter of law to establish that the testator is highly susceptible to undue influence. There is no evidence to show that the testator was not a free agent or that any degree of force or coercion was such that the testator's free agency was destroyed by undue influence. For the same reason, there is a lack of evidence to support that any fraud or fraudulent misrepresentations by [Dr. Posner] affected the judgment of [Ms. Posner].

The Court of Appeals has identified seven elements to be considered in determining whether undue influence exists. In *Moore v. Smith,* 321 Md. 347, 582 A.2d 1237 (1990), the Court stated:

> Although we have not laid down a test to determine the existence of undue influence with mathematical accuracy, we

have recognized in many appellate cases several elements characteristic of its presence, including: (1) the benefactor and beneficiary are involved in a relationship of confidence and trust; (2) the will contained substantial benefit to the beneficiary; (3) the beneficiary caused or assisted in effecting execution of a will; (4) there was an opportunity to exert influence; (5) the will contains an unnatural disposition; (6) the bequests constitute a change from a former will; and (7) the testator was highly susceptible to the undue influence. 321 Md. at 353, 582 A.2d 1237. *Moore* involved a challenge to a will, but the elements are similar in a challenge to an inter vivos transfer such as a revocable trust. *See Treffinger v. Sterling,* 269 Md. 356, 305 A.2d 829 (1973). Additionally, there must be legally sufficient evidence that the undue influence actually affected the testator. *See Lancaster v. Bank of New York,* 147 Conn. 566, 164 A.2d 392, 396 (1960). The circuit court decision was on a narrow ground, but we will comment on each element for the benefit of the court and parties on remand. In our view, there is legally sufficient evidence to create a jury issue with respect to each element, viewing the evidence in a light most favorable to appellants.

1. Ms. Posner and Dr. Posner were involved in a relationship of confidence and trust. At various times, Dr. Posner handled Ms. Posner's financial affairs, pursuant to a power of attorney.

2. The will and revocable trust contained substantial benefits for Dr. Posner and his family.

3. Mr. Willen, in his deposition, testified that Dr. Posner was involved in discussions with respect to Ms. Posner's estate and its distribution with respect to development of the estate plan. Additionally, Dr. Posner was involved in the funding of the revocable trust. Mr. Willen also testified that he had discussions with Dr. Posner concerning scheduling the execution of the 1996 documents and videotaping the proceedings.

4. There is evidence of numerous meetings and other communications between Ms. Posner and Dr. Posner and, thus, substantial evidence of opportunity to exert influence.

5. The will virtually disinherited appellants, two of Ms. Posner's children. In the second videotaped proceeding on March 8, 1996, at the beginning of the session, Dr. Scott Spier, a psychiatrist, asked Ms. Posner a series of questions with the stated intention of determining her state of mental awareness. He stated his satisfaction with the responses. We mention it at this point to note that Ms. Posner, in response to a general request to identify the natural objects of an estate, identified children and grandchildren. There is evidence that, at various times, Ms. Posner expressed the desire to treat her three children equally and, in fact, executed documents evidencing that intent.

6. The disposition of assets in the January 3, 1996, documents reflect a change from prior wills.

7. There is evidence that Ms. Posner was suffering from physical ailments, including lung and heart disease. There is also evidence that she was suffering from depression, anxiety, and intermittent confusion.

As mentioned previously, Dr. Posner relies heavily on the two videotapes. If other evidence were present and sufficient to create triable issues of fact, evidence to the contrary, including the videotapes, while perhaps persuasive at trial, would not be a basis upon which to enter summary judgment. Moreover, we have viewed the videotapes and, in our view, an inference can be drawn that is consistent with the claims of fraud and undue influence. The tapes depict orchestrated events, not spontaneous impartial proceedings, at which appellants are not represented. The March 8 proceeding reflects that Ms. Posner did not recall the extent of her assets or the bequests that she had made on January 3 until she was asked leading questions, to which she responded appropriately. While the tapes constitute strong evidence of capacity, which is not challenged, and while the tapes in and of themselves are not sufficient from which to infer the fact of manipulation, undue influence, or fraud, they are consistent with an inference that Ms. Posner was susceptible to manipulation.

The documents executed by Ms. Posner prior to and including January 3, 1996, and the disposition of assets in those documents, are consistent with an inference that she was susceptible to undue influence by various persons who were in a position of trust and confidence. The evidence permits an inference that, when Dr. Posner and/or Mr. Willen discussed the issues with Ms. Posner, it produced a result that benefitted Dr. Posner. To the contrary, when Ms. Geduldig, Dr. Gordon, or Dr. Browne discussed the issues with Ms. Posner, it produced a result that was less favorable to Dr. Posner, and consequently, more favorable to Ms. Geduldig and Dr. Gordon. Ms. Posner, on occasion, executed wills that, by recital, did not accurately reflect prior wills. The totality of the evidence, while largely circumstantial, is sufficient to create a triable issue of fact.

### III.

Ms. Geduldig and Dr. Gordon contend that there was legally sufficient evidence of fraud by Dr. Posner that affected Ms. Posner's distribution of assets. The relevant evidence, viewed in a light favorable to appellants, is as follows.

Dr. Posner misrepresented to Ms. Posner that Dr. Gordon and Dr. Browne had over-medicated her so as to cause her to be confused and to gain control of her assets.

In our recitation of the facts, we discussed evidence concerning Dr. Posner's conversations with Ms. Posner and the filing of a claim with the licensing board in Pennsylvania. Dr. Posner, in his deposition, stated that his conclusion that Dr. Browne had over-prescribed medications in dosages deliberately calculated to cause confusion was based on information given to him by Dr. William Davidson, a pulmonologist. Additionally, he testified that Dr. Debra Barbour, a cardiologist, and Dr. Scott Spier, a psychiatrist, indicated that the dosages were too high and could cause confusion. These doctors were all colleagues of Dr. Posner at Mercy Hospital.

In his deposition, Dr. Davidson stated that he had never reached a conclusion that the dosages prescribed for Ms.

Posner were calculated to cause confusion, and that he did not recall telling anyone that. When asked if anyone had told him that Ms. Posner's medications could have caused confusion, he stated that probably Dr. Posner did, but he did not remember for sure. In her deposition, Dr. Barbour testified that she examined Ms. Posner on June 1, 1994. She stated that Ms. Posner was not confused at that time and that she—Dr. Barbour—had never reached any conclusion with respect to the use of medications. She also testified that she knew there were discussions concerning the use of the medications, but she was not part of that discussion.

Dr. Spier, in his deposition, testified that he examined Ms. Posner on June 1, 1994, and that she was not confused at that time. He did not express any personal opinion but did indicate that he was aware there was some concern as to whether Ms. Posner had been over-sedated. He identified Dr. Davidson as having that concern.

Dr. Carl Salzman, a professor of psychiatry of Harvard University, an expert retained by Dr. Posner for this case, testified that he reviewed the medical records of Ms. Posner. In pertinent part, he testified in his deposition:

Q. Why have you concluded that no dose of psychotropic medication by Dr. Gordon or Dr. Browne was calculated to cause confusion?

A. There's no evidence anywhere in the chart that Dr. Browne or Dr. Gordon wished to make Rose confused. There's no implication or evidence at all that I could find. I don't believe it to be true.

In response to another question inquiring about the effect of medication on Ms. Posner on April 4, 1994, Dr. Salzman stated:

Q. That's correct, as it is written. The problem is she is receiving many different medications and some are being increased at the same time that the BuSpar is being increased, so it's possible that the BuSpar was helpful, or it's possible that she was just having a better day and breathing better as a result of it. And that's the problem with the

records is that it's so hard to conclude with reasonable medical certainty that the doses of medication that were given to Rose were directly improving her state. Just as I'm not able to state with reasonable medical certainty whether or not they were causing confusion, which is what you asked me earlier, because there are so many medications.

Her mental state and her mood is changing on an almost daily basis and doses are going up and down. It's not possible to make clear conclusive statements about the effects of the drugs on her state.

Ms. Geduldig and Dr. Gordon, in answers to interrogatories, identified Dr. Jeffrey S. Janofsky, a professor of psychiatry at Johns Hopkins Hospital, as an expert witness for this case. The answers indicate that Dr. Janofsky reviewed Ms. Posner's medical records and concluded that she had been medicated appropriately.

Finally, as mentioned earlier herein, Dr. Bruce Bogdanoff, a neurologist, examined Ms. Posner in May, 1994, and concluded that her intermittent confusion was caused by cerebral hypoxia, as a result of her lung and heart disease.

Dr. Browne testified, as discussed earlier in this opinion, that Ms. Posner told him that she believed there was a conspiracy to imprison her. Dawn D.B. Stehle, a registered nurse and Dr. Browne's daughter, stated in an affidavit that Ms. Posner told her in 1995 that she believed there had been a plot in 1994, referring to Dr. Browne, to over-medicate her and imprison her to gain control of her assets. There is circumstantial evidence that Ms. Posner believed that Dr. Gordon was part of the conspiracy. There is evidence that Dr. Posner discussed with Ms. Posner that she had been deliberately over-medicated. There is evidence that Ms. Posner called Dr. Gordon a burglar and a thief after Dr. Posner told Ms. Posner that Dr. Gordon was a burglar and a thief.

Dr. Posner misrepresented to Ms. Posner that Ms. Geduldig and Dr. Gordon attempted to have her declared incompetent. In the proceeding seeking a temporary restraining order in

Pennsylvania, the petitioners expressly alleged that Ms. Posner was competent. In the petition seeking a limited guardianship, there was no allegation that Ms. Posner was incompetent, but rather, incapacitated. Similarly, Dr. Posner also had prepared a guardianship petition in which he alleged that Ms. Posner was incapacitated.

Dr. Posner misrepresented to Ms. Posner that Dr. Gordon was a burglar and a thief. The only evidence relevant to this issue is that Dr. Gordon had removed items from Ms. Posner's apartment for safekeeping.

With respect to causation, there is evidence that the misrepresentations just discussed were made by Dr. Posner to Ms. Posner. There is also evidence that Ms. Posner believed those accusations; specifically, there is evidence that she believed there was a conspiracy to over-medicate her, that Dr. Gordon was a thief and a burglar, and that Ms. Geduldig and Dr. Gordon had attempted to have her declared incompetent. If the statements were in fact untrue, there is evidence that Ms. Posner believed them, which gives rise to a permissible inference that she acted upon them. Again, we observe the differences in the disposition of assets in the various documents executed by Ms. Posner.

Dr. Posner, in his brief, essentially argues that the statements allegedly made by Dr. Posner were true and that there was simply no evidence of fraud or any undue influence. As stated previously, we conclude there is sufficient circumstantial evidence to create a fact question, and because there is evidence that Ms. Posner believed the statements, if proved to be untrue, the changes in disposition of assets could be permissibly found to be as the result of the misrepresentations.

We hasten to add that, with respect to both the fraud and undue influence claims, we hold only that there are triable issues of fact and do not purport to express an opinion with respect to the ultimate outcome. We have concentrated on evidence favorable to Ms. Geduldig and Dr. Gordon because it determines whether there is a triable issue.

## IV.

Appellants contend that they are entitled to recover punitive damages if they prove that Dr. Posner committed intentional misconduct constituting fraud or undue influence. Appellee argues that appellants have waived any claim for punitives because they did not argue it below. We conclude that punitive damages are not available for reasons discussed in part 3 of this opinion. *See Kann,* 344 Md. at 712, 690 A.2d 509.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.**